# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF NEW YORK

DON-LEE GRAYSON,

                              Plaintiff,

          v.                                        9:16-CV-1118
                                                          (GLS/ATB)

C.O. COURTNEY and C.O. JAQUISH,

                            Defendants.

DON-LEE GRAYSON, Plaintiff, pro se
ERIK BOULE PINSONNAULT, Asst. Attorney General, for Defendant Jaquish

ANDREW T. BAXTER
United States Magistrate Judge

## REPORT-RECOMMENDATION

In this civil rights action, plaintiff alleges that he was subjected to unwanted second-hand or environmental tobacco smoke ("ETS") while in the custody of the New York Department of Corrections and Community Supervision ("DOCCS") in the Clinton Correctional Facility Annex ("Clinton Annex") between October 6, 2015 and April 6, 2017.  (Amended Compl. ("AC"), Dkt. No. 27; Transcript of Pl.'s 11/9/2017 Dep. ("Dep. Tr.") at 10, 14, Dkt. No. 52-2 at 13, 17; Brousseau Decl. ¶ 11 & Ex. A, Dkt. No. 52-5).  Plaintiff claims that defendants "Courtney" and Jaquish, both corrections officers ("C.O.") at Clinton Annex, condoned violations of, and failed to enforce, the facility's no-smoking policy, causing plaintiff to suffer serious allergic reactions. (AC ¶¶ III(7)-III(9), V(13)).  Plaintiff's sole surviving claim asserts a violation of his Eighth Amendment right to be free from unconstitutional conditions of

confinement.  (AC ¶ VI(C)).[1]  Plaintiff seeks declaratory, injunctive, and monetary relief. (AC ¶ VI).

Defendant Joshua Jaquish has filed a summary judgment motion, contending that:  (1) plaintiff failed to exhaust available administrative remedies;[2] (2) defendant Jaquish did not violate plaintiff's Eighth Amendment rights with respect to ETS exposure; and (3) plaintiff has failed to establish defendant Jaquish's personal involvement in any constitutional violation, except during the limited time period when he worked in plaintiff's housing unit at Clinton Annex.  (Def.'s Mem. of Law, Dkt. No. 52-1 at 2).[3]  Although plaintiff received written notice in early April 2018 about the consequences of failing to respond to the summary judgment motion, from both defense counsel (Dkt. No. 52) and the Clerk of Court (Dkt. No. 53), plaintiff did not file a response to the motion, nor did he seek an extension of the deadline to respond.

---

[1] Other claims initially filed by plaintiff, including a First Amendment right-of-association claim, were previously dismissed.  (See 11/17/2016 Decision and Order, Dkt. No. 8).

[2] On June 23, 2017, defendant Jaquish moved to dismiss plaintiff's Amended Complaint pursuant to Fed. R. Civ. P. 12(b)(6), in part based on plaintiff's failure to exhaust administrative remedies.  (Dkt. No. 35).  By Report-Recommendation dated August 22, 2017, this court recommended denial of the motion to dismiss based on failure to exhaust (Dkt. No. 39 at 7-10), which recommendation Senior District Judge Sharpe adopted on September 14, 2017 (Dkt. No. 40).  This court found that, while it was clear on the face of the complaint that plaintiff did not exhaust his administrative remedies, it was unclear from the complaint whether administrative remedies were "unavailable" to plaintiff under *Williams v. Priatno*, 829 F.3d 118, 122 (2d Cir. 2016), which is discussed further below.  (Dkt. 39 at 8-10).

[3] The defendant identified by plaintiff as C.O. Courtney has never been served, and former defense counsel has advised that plaintiff is apparently mistaken in identifying anyone named "Courtney" as a Correction Officer who worked in the area where plaintiff was confined at the Clinton Annex during the relevant time period.  (See 9/28/17 Ltr. of AAG Kish, Dkt. No. 44).  Plaintiff was provided a further opportunity to pursue discovery to determine the identity of the other officer he intended to sue (see Dkt. Nos. 45-47), but has never moved to substitute another named defendant for "C.O. Courtney."

2

Defendant Jaquish's summary judgment motion (Dkt. No. 52) has been referred to me for Report and Recommendation by the Honorable Gary L. Sharpe, Senior United States District Court Judge.

For the following reasons, this court will recommend granting defendant Jaquish's summary judgment motion, based both on plaintiff's failure to exhaust administrative remedies and the lack of support for plaintiff's Eighth Amendment claim, on the merits. The court will recommend dismissing the plaintiff's action against not only defendant Jaquish, but also against "C.O. Courtney," because plaintiff's failure to exhaust his administrative remedies would preclude him from pursuing his Eighth Amendment claim against any defendant.

## I.    **<u>Summary Judgment</u>**

Summary judgment is appropriate where there exists no genuine issue of material fact and, based on the undisputed facts, the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56; *Salahuddin v. Goord*, 467 F.3d 263, 272–73 (2d Cir. 2006). "Only disputes over ["material"] facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986). It must be apparent that no rational finder of fact could find in favor of the non-moving party for a court to grant a motion for summary judgment. *Gallo v. Prudential Residential Servs.*, 22 F.3d 1219, 1224 (2d Cir. 1994).

The moving party has the burden to show the absence of disputed material facts by informing the court of portions of pleadings, depositions, and affidavits which

support the motion. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party satisfies its burden, the nonmoving party must move forward with specific facts showing that there is a genuine issue for trial. *Salahuddin v. Goord*, 467 F.3d at 273. In that context, the nonmoving party must do more than "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). However, in determining whether there is a genuine issue of material fact, a court must resolve all ambiguities, and draw all inferences, against the movant. *See United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962); *Salahuddin*, 467 F.3d at 272.

To be sufficient to create a "factual issue," in the context of a summary judgment motion, an allegation in an affidavit or verified complaint must not be conclusory or overly general. *Smith v. Woods*, 9:03-CV-480 (DNH/GHL), 2006 WL 1133247, at *3 & n.10 (N.D.N.Y. Apr. 24, 2006). Even where a complaint or affidavit contains specific assertions, the allegations "may still be deemed conclusory if [they are] (1) 'largely unsubstantiated by any other direct evidence' and (2) 'so replete with inconsistencies and improbabilities that no reasonable juror would undertake the suspension of disbelief necessary to credit the allegations made in the complaint.'" *Id.,* 2006 WL 1133247, at *3 & n.11 (quoting *Jeffreys v. City of New York*, 426 F.3d 549, 554-55 (2d Cir. 2005) ("While it is undoubtedly the duty of district courts not to weigh the credibility of the parties at the summary judgment stage, in the rare circumstance where the plaintiff relies almost exclusively on his own testimony, much of which is contradictory and incomplete, it will be impossible for a district court to determine

whether 'the jury could reasonably find for the plaintiff,' . . . and thus whether there are any "genuine" issues of material fact, without making some assessment of the plaintiff's account.")).

In *Govan v. Campbell*, U.S. District Judge Gary L. Sharpe cogently summarized the standards in the Second Circuit for evaluating summary judgment motions when a pro se plaintiff has not properly responded. The liberal standard applying to the evaluation of the civil rights claims of pro se litigants

> . . . does not excuse a pro se litigant from following the procedural formalities of summary judgment. *Showers v. Eastmond*, 00 CIV. 3725, 2001 WL 527484, at *2 (S.D.N.Y. May 16, 2001). More specifically, Local Rule 7.1(a)(3) of this court specifically provides that "any facts set forth in the [moving party's] Statement of Material Facts shall be deemed admitted unless specifically controverted by the opposing party." Local Rule 7.1(a)(3) further requires that the "non-movant shall file a Statement of Material Fact which mirrors the movant's statement in matching numbered paragraphs and which set forth a specific reference to the record where the material fact is alleged to arise." The courts of the Northern District have adhered to a strict application of Local Rule 7.1(a)(3)'s requirement on summary judgment motions. *Giguere v. Racicot*, 00-CV-1178, 2002 WL 368534, at *2 (N.D.N.Y. March 1, 2002) (*inter alia* citing *Bundy Am. Corp. v. K-Z Rental Leasing, Inc.*, 00-CV-260, 2001 WL 237218, at *1 (N.D.N.Y. March 9, 2001)).
>
> Furthermore, this Circuit adheres to the view that nothing in Rule 56 imposes an obligation on the court to conduct a search and independent review of the record to find proof of a factual dispute. *Amnesty America v. Town of West Hartford*, 288 F.3d 467, 470 (2d Cir. 2002). As long as the local rules impose a requirement that parties provide specific record citations in support of their statement of material facts, the court may grant summary judgment on that basis. *Id*. at 470-71.

*Govan v. Campbell*, 289 F. Supp. 2d 289, 295 (N.D.N.Y. 2007).

In this case, although plaintiff received proper notice of his obligation to respond to defendant's summary judgment motion in accordance with Local Rules, the plaintiff

did not file a response or a Statement of Material Fact, as required by Local Rule 7.1(a)(3). Consequently, the court may accept the properly supported facts contained in the defendant's Rule 7.1 statement (Dkt. No. 52-3) as true for purposes of this motion. *See Govan v. Campbell*, 289 F. Supp. 2d at 295-96. However, the court will nonetheless review the entire record, including plaintiff's deposition, in determining if there are any material facts in dispute.

## II.  Exhaustion of Administrative Remedies

### A.  Legal Standards

The Prison Litigation Reform Act, ("PLRA"), 42 U.S.C. §1997e(a), requires an inmate to exhaust all available administrative remedies prior to bringing a federal civil rights action. The exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and regardless of the subject matter of the claim. *See Giano v. Goord*, 380 F.3d 670, 675-76 (2d Cir. 2004) (citing *Porter v. Nussle,* 534 U.S. 516, 532 (2002). Inmates must exhaust their administrative remedies even if they are seeking only money damages that are not available in prison administrative proceedings. *Id.* at 675.

The failure to exhaust is an affirmative defense that must be raised by the defendants. *Jones v. Bock*, 549 U.S. 199, 216 (2007); *Johnson v. Testman*, 380 F.3d 691, 695 (2d Cir. 2004). As an affirmative defense, it is the defendants' burden to establish that plaintiff failed to meet the exhaustion requirements. *See, e.g., Key v. Toussaint*, 660 F. Supp. 2d 518, 523 (S.D.N.Y. 2009) (citations omitted).

The Supreme Court has held that in order to properly exhaust an inmate's

6

administrative remedies, the inmate must complete the administrative review process in accordance with the applicable state rules. *Jones*, 549 U.S. at 218-19 (citing *Woodford v. Ngo*, 548 U.S. 81 (2006)). In *Woodford*, the Court held that "proper" exhaustion means that the inmate must complete the administrative review process in accordance with the applicable procedural rules, including deadlines, as a prerequisite to bringing suit in federal court. 548 U.S. at 90-103.

The grievance procedure in New York is a three-tiered process. The inmate must first file a grievance with the Inmate Grievance Resolution Committee ("IGRC"). N.Y. Comp. Codes R. & Regs., tit. 7 §§ 701.5(a)(1) and (b). An adverse decision of the IGRC may be appealed to the Superintendent of the Facility. *Id*. § 701.5(c). Adverse decisions at the Superintendent's level may be appealed to the Central Office Review Committee ("CORC"). *Id*. § 701.5(d). The court also notes that the regulations governing the Inmate Grievance Program ("IGP") encourage the inmate to "resolve his/her complaints through the guidance and counseling unit, the program area directly affected, or other existing channels (informal or formal) prior to submitting a grievance." *Id.* § 701.3(a) (Inmate's Responsibility).

Until recently, the Second Circuit utilized a three-part inquiry to determine whether an inmate had properly exhausted his administrative remedies. *See Hemphill v. State of New York*, 380 F.3d 680, 686 (2d Cir. 2004). The *Hemphill* inquiry asked (1) whether the administrative remedies were available to the inmate; (2) whether defendants' own actions inhibiting exhaustion estops them from raising the defense; and (3) whether "special circumstances" justify the inmate's failure to comply with the

7

exhaustion requirement. *Id.*

However, the Supreme Court has now made clear that courts may not excuse a prisoner's failure to exhaust because of "special circumstances." *Ross v. Blake*, 136 S. Ct. at 1857. "'[M]andatory exhaustion statutes like the PLRA establish mandatory exhaustion regimes, foreclosing judicial discretion.'" *Riles v. Buchanan*, No. 15-3336-pr, 2016 WL 4572321, at *2 (2d Cir. Sept. 1, 2016) (quoting *Ross*, __ U.S. at __, 136 S. Ct. at 1857). Although *Ross* did away with the "special circumstances" exception, the other two factors in *Hemphill*–availability and estoppel–are still valid. The court in *Ross* referred to "availability" as a "textual exception" to mandatory exhaustion, and "estoppel" has become one of the three factors in determining availability. *Ross*, __ U.S. at __, 136 S. Ct. at 1858. Courts evaluating whether an inmate has exhausted his or her administrative remedies must focus on whether those remedies were "available" to the inmate. *Id.; see also Riles*, 2016 WL 4572321 at *2. An administrative procedure is "unavailable" when

> (1) "it operates a simple dead end – with officers unable or consistently unwilling to provide any relief to aggrieved inmates; (2) it is "so opaque that is [sic] becomes, practically speaking, incapable of use"; or (3) "prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation."

*Riles, supra* (quoting *Ross*, __ U.S. at __, 136 S. Ct. at 1859-60).

In *Ross*, the Supreme Court gave examples of the circumstances under which each of the above would apply. *Ross*, __ U.S. at __, 136 S. Ct. at 1859-60. The first circumstance listed above involves a case in which the relevant "administrative procedure" lacks the authority to provide "any" relief. *Id.* at 1859. The second

8

example is when the administrative procedure "exists," but is so complicated or "opaque" that no ordinary prisoner could "discern or navigate it." *Id.* Finally, administrative remedies are not available if prison administrators prevent inmates from taking advantage of the grievance process by misleading or threatening them, preventing their use of the administrative procedure. *Id.* at 1860.

In *Williams v. Priatno*, 829 F.3d 118, 123-27 (2d Cir. 2016), the Second Circuit considered whether administrative remedies had been "actually available" to an inmate plaintiff under *Ross*, after the district court granted the defendants' motion to dismiss for failure to exhaust. The plaintiff alleged that, while housed in the special housing unit ("SHU"), he drafted a grievance that he delivered to a correction officer to forward to the grievance office on his behalf. *Id.* at 120-121. Approximately two weeks later, the plaintiff was transferred to a different facility. *Id.* at 121. He never received a response to his grievance, and alleged that it was never filed by the officer to whom he had given it. It was undisputed that plaintiff never appealed the grievance. *Id.*

The defendants in *Williams* argued that even if the grievance was never filed, the plaintiff was required to appeal it and complete the grievance process. *Id.* at 124. The defendants relied on a DOCCS regulation that provided that "an inmate may appeal a grievance 'to the next step' if he does not receive a timely response." *Id.* (quoting N.Y. Comp. Codes R. & Regs. tit. 7, § 701.6(g)(2)). The Second Circuit rejected this argument and held that, for an inmate in the plaintiff's situation, the regulatory scheme was so "opaque" and "confusing" as to be practically unavailable. *Id.* The Second Circuit found that DOCCS regulations "only contemplate appeals of grievances that

9

[have been] actually filed . . . [and] give no guidance whatsoever to an inmate whose grievance was never filed." *Id*. Thus, *Williams* holds that "the process to appeal an unfiled and unanswered grievance is prohibitively opaque, such that no inmate could actually make use of it." *Id*. at 126.[4] *See also Medina v. Napoli*, 725 F. App'x 51, 53-54 (2d Cir. 2018) (following *Williams* in the context of a summary judgment motion).

### B.    Relevant Facts

Defendant Jaquish has established, through his Statement of Material Fact (Dkt. No. 52-3),[5] without opposition by plaintiff,[6] that:  (1) DOCCS has an inmate grievance process established by 7 N.Y.C.R.R. § 701.7; (2) plaintiff's claim regarding the conditions of his confinement was the proper subject for a grievance under DOCCS procedures; (3) Clinton Annex and Washington (to which plaintiff was transferred on April 6, 2017) had a fully functioning inmate grievance process available, and this process was explained to each inmate upon their arrival at the facility; (4) all documents related to grievances filed at Clinton Annex or Washington, including the grievance itself, are stored and maintained in the facility's grievance office in the regular course of that office's activities for four years; (5) facility records show that plaintiff did not

_____

[4] My summary of *Williams* tracks that of Magistrate Judge Stewart in *Berman v. Durkin*, No. 9:13-CV-136 (LEK/DJS), 2017 WL 1215814, at *8 (N.D.N.Y. Mar. 10, 2017), (Rep't-Rec.), *adopted*, 2017 WL 1207834 (N.D.N.Y. Mar. 31, 2017).

[5] The defense Statement of Material Fact was supported by declarations of (1) Rachel Sequin, the Assistant Director of the Inmate Grievance Program ("IGP") at DOCCS (Dkt. No. 52-4); (2) Tara Brousseau, the IGP Supervisor at Clinton Annex (Dkt. No. 52-5); Matthew Walters, the IGP Supervisor at Washington Correctional Facility ("Washington"), to which plaintiff was transferred on April 6, 2017, (Dkt. No. 52-6); and C.O. Jaquish (Dkt. No. 52-7).

[6] The court has considered plaintiff's amended complaint and deposition transcript (Dkt. No. 52-2 at 3-95), in evaluating whether any of the material facts alleged in the defense Statement of Material Fact were disputed.

10

file any grievances at Clinton or its Annex from October 6, 2015 until April 6, 2017, or at Washington from April 6, 2017 through January 22, 2018; (6) C.O. Jaquish, who would have been notified of any grievance against him, and would have been required to prepare a response, never received a grievance from plaintiff; (7) plaintiff has not appealed any grievances to CORC.  (Def.'s Stmt. of Mat. Fact ¶¶ 5-14) .

During his deposition, plaintiff testified that he "didn't even know what a grievance was" during his first two weeks at Clinton Annex.  (Dep. Tr. at 28, Dkt. No. 52-2 at 31).  However, he also testified that he learned at Clinton Annex how to use the grievance system, and described the various steps in the process.  (Dep. Tr. at 29-30, 44).

In the amended complaint, plaintiff claimed that he

> used the Prisoner Grievance Procedure available at [Clinton Annex] to try to resolve the problem he now claims.  On May 11, 2016, Plaintiff presented the facts relating to his complaint.  Until the present day, Plaintiff has not received any responses.  No denial of receiving the grievances, nothing.  No appeal has been taken due to no reply from the Grievance Committee or Superintendent M. Kirkpatrick.

(AC ¶ IV(10)).  During his deposition, plaintiff claimed that he attempted to file grievances at Clinton Annex about the ETS at least seven times between May 2016 and June or July of that year.  (Dep. Tr. at 43-45).  He testified that he deposited the grievances in the drop box labeled IGRC, but never received any response.  (Dep. Tr. at 45-46).  Plaintiff also claimed that, during the same time period, he wrote a letter of complaint directly to the facility Superintendent, but never received any response to that complaint either.  (Dep. Tr. at 46-47).  Plaintiff provided no corroborating evidence

for these claims, such as copies of some of the grievances or the complaint that he

claimed he attempted to submit at Clinton Annex.

## C.    Analysis

In *Ferrer v. Racette*, Chief District Judge Glenn T. Suddaby explained, in the

context of a summary judgment motion, who bears the burden of proof and production

on certain aspects of the issue of exhaustion:

> "Because failure to exhaust is an affirmative defense, . . . defendants bear the
> initial burden of establishing, by pointing to 'legally sufficient sources' such as
> statutes, regulations, or grievance procedures, that a grievance process exists and
> applies to the underlying dispute." . . .  "[O]nce a defendant has adduced reliable
> evidence that administrative remedies were available to the plaintiff and that the
> plaintiff nevertheless failed to exhaust those administrative remedies, the plaintiff
> must then 'counter' the defendant's assertion by showing exhaustion [or]
> unavailability." . . .

*Ferrer v. Racette*, No. 9:14-CV-1370 (GTS/DJS), 2017 WL 6459525, at *12 (N.D.N.Y.

Dec. 18, 2017) (citing, inter alia, *Hubbs v. Suffolk Cnty. Sheriff's Dept.*, 788 F.3d 54, 59

(2d Cir. 2015) ("If the defendants meet this initial burden, administrative remedies may

nonetheless be deemed unavailable if the plaintiff can demonstrate that other factors . . .

rendered a nominally available procedure unavailable as a matter of fact.")[7]  *Accord*,

*Scott v. Kastner-Smith*, 298 F. Supp. 3d 545, 554-55 (W.D.N.Y. 2018) (pending

appeal).

---

[7] I agree with Magistrate Judge Peebles' cogent analysis that, while the burden of
production may shift to a plaintiff with respect to certain aspects of the exhaustion issue, "the
ultimate burden of proof with respect to the exhaustion defense remains, at all times, with the
defendant."  *See, e.g., Bailey v. Fortier*, No. 9:09-CV-0742 (GLS/DEP), 2012 WL 6935254, at
*5-6 (N.D.N.Y. Oct. 4, 2012) (Rep't-Rec.), *adopted*, 2013 WL 310306 (N.D.N.Y. Jan. 25, 2013);
*Nelson v. Plumley*, No. 9:12-CV-422 (TJM/DEP), 2015 WL 4326762, at *7-8 (N.D.N.Y. July 14,
2015) (Rep't-Rec.), *adopted*, 2013 WL 1305338 (N.D.N.Y.  Mar. 18, 2013).

As I noted above, the defendant has established, without opposition from the plaintiff, that the grievance process existed at Clinton Annex and Washington, that it applied to plaintiff's issues regarding the conditions of his confinement, and that there is no record of plaintiff filing a grievance with respect to his complaints regarding ETS, or any appeal of any such grievance. Accordingly, the burden of production would then shift to the plaintiff to adduce evidence supporting his claim that he attempted to file a grievance that was never received or filed by the Inmate Grievance Program at the facility, under circumstances that would establish "unavailability" of the grievance process pursuant to *Williams v. Priatno*.

The only evidence in the record that plaintiff actually attempted to file such a grievance was the unsupported allegation in his amended complaint that he filed a grievance on or about May 16, 2016, and the more expansive claim during his deposition that plaintiff unsuccessfully attempted to file grievances at least seven times over several months starting in May 2016. This court finds that, given the complete lack of corroboration of plaintiff's inconsistent claims about his purported attempt(s) to file a grievance relating to ETS at Clinton Annex, no rational fact finder could conclude that plaintiff actually attempted to file such a grievance. Accordingly, there is no material issue of fact that would support the position that the grievance process was unavailable to plaintiff under *Williams*. *See, e.g.*, *Rodriguez v. Cross*, No. 15-CV-1079 (GTS/CFH), 2017 WL 2791063, at *7 (N.D.N.Y. May 9, 2017) (Rep't-Rec.), *adopted*, 2017 WL 2790530 (N.D.N.Y. June 27, 2017) ("Courts in this Circuit have continuously held that mere contentions or speculation of grievances being misplaced by officers do

not create a genuine issue of material fact when there is no evidence to support the allegations.") (collecting cases); *Nelson v. Artus*, No. 14-CV-6634, 2016 WL 1023324, at *2-3 (W.D.N.Y. Mar. 8, 2016) (while plaintiff could have provided a copy of the grievance appeal that he claimed that he filed, "he failed to respond to the summary judgment motion, and has instead provided nothing"; the unsupported allegations in plaintiff's complaint are insufficient to withstand a properly supported summary judgment motion); *Chambers v. Johnpierre*, No. 3:14-CV-1802, 2016 WL 5745083, at *6-7 (D. Conn. Sept. 30, 2016) (plaintiff's unsupported statements that he filed grievances and grievance appeals before his transfer to another facility "do not create an issue of fact with regard to the exhaustion of his claims"); *Engles v. Dougherty*, No. 9:14-CV-1185 (TJM/ATB), 2017 WL 6466309, at *5-6 & n.5 (N.D.N.Y. Aug. 22, 2017), (Rep't-Rec.), *adopted*, 2017 WL 6463074 (N.D.N.Y. Dec. 18, 2017) (plaintiff failed to respond to the defense summary judgment motion, and there is no basis to credit plaintiff's unsupported assertion that he filed a grievance that was intentionally destroyed or tampered with by unknown corrections officers, particularly when his claims are inconsistent with a later grievance about mail tampering and given the fact that so many other of plaintiff's grievances did make it to the CORC)[8]; *Scott v. Kastner-Smith*, 298 F. Supp. 3d at 554-55 ("Plaintiff fails to raise a triable issue of fact that these administrative remedies were unavailable to him. . . [;] [a]lthough Plaintiff alleged that he did not receive any response to his grievances in his initial Complaint . .

---

[8] In this case there was no evidence of other grievances submitted by plaintiff Grayson during the same time period that were filed and processed by the facility or CORC. However, during his deposition, plaintiff complained that the grievance process consisted of "a bunch of tedious steps," suggesting a general disinclination to pursue grievances. (Dep. Tr. at 29).

. , Plaintiff provides no evidence that he even submitted a formal grievance).[9]

During the time relevant to his amended complaint, plaintiff was housed in general population in the Clinton Annex and tacitly acknowledges that he had access to the drop box used for submitting grievances. Some district court cases in the Second Circuit suggest that *Williams* should be limited to its particular facts, *e.g.*, by not applying its holding to plaintiffs who are not confined in a SHU, and who do not need to rely on correction officers to submit their grievances.[10] *See, e.g.*, *Shaw v. Ortiz*, No. 15-CV-8964, 2016 WL 7410722, at *6 (S.D.N.Y. Dec. 21, 2016) ("the factual scenario here is different from that in *Williams* where the Second Circuit found that part of the IGP's regulatory scheme was 'so opaque and so confusing that . . . no reasonable prisoner c[ould] use' it.) (citing, *Mena v. City of New York*, No. 13-CV-2430, 2016 WL 3948100, at *5 (S.D.N.Y. July 19, 2016) (finding that the Second Circuit's decision in Williams "hinged on the 'extraordinary circumstances' specific to the case before it")); *Rodriguez v. Cross*, No. 15-CV-1079 (GTS/CFH), 2017 WL 2791063, at *7 (N.D.N.Y. May 9, 2017) ("Courts have denied a defendant's motion for summary judgment when faced with an unanswered and unfiled grievance drafted in SHU. . . . This is distinguishable from plaintiff's alleged July 19, 2014 grievance drafted in keeplock.")

---

[9] Cf. *Medina v. Napoli*, 725 F. App'x at 54 in which the Second Circuit, relying on *Williams,* overturned the district court's granting of a summary judgment motion, noting that the plaintiff's allegations that defendants took action to prevent the filing of grievances were "supported by witness testimony." In this case, there is no such corroboration of plaintiff's claims that he attempted to file one or more grievances about ETS at Clinton Annex.

[10] In *Medina v. Napoli*, 725 F. App'x at 53-54, the Second Circuit followed *Williams* in a case involving a SHU inmate, but absent the additional circumstance of a transfer to a different facility, which might have further complicated the inmate's ability to file a grievance.

(Rep't-Rec.), *adopted*, 2017 WL 2790530 (N.D.N.Y. June 27, 2017).

This court concludes, despite some district court opinions suggesting otherwise, that the reasoning of *Williams*, which found that DOCCS procedures provided no clear guidance on how any inmate should proceed if a grievance is never filed, could apply even when the inmate is not confined in SHU. *See Berman v. Durkin*, No. 9:13-CV-136 (LEK/DJS), 2017 WL 1215814, at *7-8 (N.D.N.Y. Mar. 10, 2017) (applying *Williams*, in denying a defense summary judgment motion alleging failure to exhaust by an Clinton inmate, apparently housed in general population, who alleged that his grievance was not filed or answered) (Rep't-Rec.), *adopted*, 2017 WL 1207834 (N.D.N.Y. Mar. 31, 2017).[11]  However, the fact that plaintiff Grayson was not confined in SHU means that he would have had better opportunities to document his efforts to submit grievances, e.g., by making copies, which supports dismissal of his claim for failure to exhaust in light of the lack of corroborating evidence. *Cf. Reid v. Marzano*, No. 9:15-CV-761 (MAD/CFH), 2017 WL 1040420, at *3 (N.D.N.Y. Mar. 17, 2017) (notwithstanding a defense caution about permitting inmates to circumvent the exhaustion rules on the basis of unsupported claims of submitting a grievance, the court still denied summary judgment noting, *inter alia*: "Although Plaintiff would have ideally made a photocopy of his grievances for his own personal file, inmates in the SHU do not have regular access to the law library like inmates in the general

---

[11] The record in *Berman* contained documentary corroboration of plaintiff's efforts to file a grievance.  2017 WL 1215814 at *6-7.  The defendants in *Berman* ultimately withdrew their affirmative defense of failure to exhaust prior to an exhaustion hearing.  See N.D.N.Y. Civil Action No. 9:13-CV-136, Dkt. No. 208).

population.")[12]

For all the foregoing reasons, this court concludes that plaintiff failed to exhaust his administrative remedies, and did not offer any evidence that would support a determination by a rational fact finder that plaintiff attempted to file a grievance at Clinton access under circumstances that would have made the grievance process "unavailable" to him.  Accordingly, the court  recommends that C.O. Jaquish's summary judgment motion be granted on the basis of plaintiff's failure to exhaust administrative remedies, and that the complaint be dismissed against the moving defendant.  Because plaintiff's failure to exhaust administrative remedies would preclude him from proceeding against any other defendant with respect to his condition-of-confinement claim, I also recommend dismissal as defendant "C.O. Courtney" even though such person, if he exists, has never been served.  *See, e.g., Engles v. Dougherty*, 2017 WL 6466309, at 6* n.6 ("[a]lthough defendant Barber has not been served and has not joined in the motion for partial summary judgment, the court must recommend dismissal as against defendant Barber . . . because even if defendant Barber had been served or is subsequently served, there is no way that this claim could be asserted against him, given plaintiff's failure to exhaust his administrative remedies").

"Where a claim is dismissed for failure to exhaust administrative remedies,

---

[12] The court in *Reid* also noted that plaintiff claim, that he unsuccessfully tried to file a grievance, was supported by his deposition testimony.  In this case, plaintiff's deposition testimony, that he tried to file a grievance on at least seven occasions, is substantially inconsistent with the allegation in his amended complaint that referenced only a single complaint on a particular date.

dismissal without prejudice is appropriate if the time permitted for pursuing administrative remedies has not expired." *Bryant v. Whitmore*, No. 9:14-CV-1042 (TJM/TWD), 2016 WL 7188127, at *7 (N.D.N.Y. Nov. 4, 2016), (Rep't-Rec.), *adopted* 2016 WL 7187349 (N.D.N.Y. Dec. 9, 2016) (citing *Berry v. Kerik*, 366 F.3d 85, 86-87 (2d Cir. 2004)). "However, if a prisoner has failed to exhaust available administrative remedies and the time in which to exhaust has expired, it is proper for the court to dismiss the complaint with prejudice because any attempt to exhaust would be futile." *Id*. (citing *Berry v. Kerik*, 366 F.3d at 86; *Hilbert v. Fischer*, No. 12 Civ. 3843, 2013 WL 4774731, at *7 (S.D.N.Y. Sept. 4, 2013) (collecting cases)). The court in *Hilbert*, explained why, in circumstances essentially the same as in this case, the dismissal of plaintiff's claims for failure to exhaust, well after the DOCCS deadlines for filing grievances or requests for late filing have expired, should be with prejudice:

> [New York] [p]risoners have 21 days from the date of the alleged occurrence to initiate the first formal step of the IGP, subject to exceptions "based on mitigating circumstances." 7 NYCRR §§ 701.5(a)(1), 701.6(g)(1)(i)(a). However, an exception to the time limit may not be granted if the request is made more than 45 days after the alleged occurrence. 7 NYCRR § 701.6(g)(1)(i)(a). Accordingly, because the time to both file a grievance and request an exception to the time limit has long expired, and because Plaintiff has not offered any reason for his delay in filing a grievance with respect to his deliberate indifference claim, the claim is dismissed with prejudice.

*See also Felix v. Simon*, 303 F. App'x 21, 22 (2d Cir. 2008) (upholding dismissal of a civil rights action with prejudice where the time permitted for filing a grievance had expired because "dismissal with prejudice, when remedies are no longer available, is required in the absence of any justification for not pursuing such remedies" (citation omitted).

### III.    Claims Relating to ETS

### A.    Legal Standard

Former Magistrate Judge George H. Lowe cogently summarized the legal

standards applicable to prisoner civil rights claims involving ETS in *Gillespie v.*

*Taylor*:

> Eighth Amendment jurisprudence on the subject of prison ETS claims
> distinguishes between claims of present harm from ETS exposure (such as where
> exposure to ETS creates or exacerbates a medical condition) and claims that ETS
> exposure will cause  the prisoner harm in the future.  *See e.g. Davidson v.*
> *Coughlin*, 920 F. Supp. 305 (N.D.N.Y. 1996).
> * * *
> ETS claims of present harm are analyzed, like other Eighth Amendment
> medical claims, pursuant to the framework set out in *Estelle v. Gamble*, 429 U.S.
> 97 . . . (1976).  Under that framework, to prevail on an Eighth Amendment claim
> of inadequate medical care, a plaintiff must show two things: (1) that the plaintiff
> had a sufficiently serious medical need; and (2) that the defendant was
> deliberately indifferent to that serious medical need. *Estelle*, 429 U.S. at 104;
> *Chance v. Armstrong*, 143 F.3d 698, 702 (2d Cir. 1998). . . .  To be sufficiently
> serious for purposes of the Constitution, a medical condition must be "a
> condition of urgency, one that may produce death, degeneration, or extreme
> pain."  *Nance v. Kelly*, 912 F.2d 605, 607 (2d Cir. 1990) (Pratt, J. dissenting)
> (citations omitted), *accord*, . . . *Chance*, 143 F.3d at 702.
> * * *
> Medical mistreatment rises to the level of deliberate indifference only
> when it "involves culpable recklessness, i.e., an act or a failure to act . . . that
> evinces 'a conscious disregard of a substantial risk of serious harm.'"  *Chance*,
> 143 F.3d, 698, 703 (quoting *Farmer v. Brennan*, 511 U.S. 825, 835 . . . (1994)).
> To establish deliberate indifference, an inmate must prove that (1) the defendant
> was aware of facts from which the inference could be drawn that the inmate had a
> serious medical need, and (2) the defendant actually drew that inference.
> *Farmer*, 511 U.S. at 837; *Chance*, 143 F.3d at 702-03.  Nonmedical personnel, . .
> . may exhibit deliberate indifference by deliberately defying the express
> instructions of a  prisoner's doctors or deliberately interfering with medically
> prescribed treatment solely for the purpose of causing an inmate unnecessary
> pain. *Gill v. Mooney*, 824 F.2d 192, 196 (2d Cir. 1987).
> * * *

19

In order to succeed on an ETS claim alleging future harm, a plaintiff must establish both an objective and a subjective element. *Gill v. Smith*, 283 F. Supp. 2d 763, 766 (N.D.N.Y. 2003). To establish the objective element, the plaintiff must show that he was exposed to unreasonably high levels of ETS. *Helling v. McKinney*, 509 U.S. 25, 35, . . . (1993); *Gill*, 283 F. Supp. 2d at 766. . . . [I]n contrast to a claim of present harm from ETS, the focus in a claim of future harm from ETS is not on whether the plaintiff has sought treatment or complained of ailments associated with exposure to ETS. *McPherson v. Coombe*, 29 F. Supp. 2d 141, 145-46 (W.D.N.Y. 1998). Rather, the objective element for a claim regarding future harm from ETS focuses on whether levels of ETS in the facility were so high that they violated contemporary standards of decency.

* * *

To establish the subjective element, a plaintiff must show "that the defendants were deliberately indifferent to the plaintiff's medical needs or safety in exposing him to ETS, 'determined in light of the prison authorities' current attitudes and conduct.'" *Gill*, 283 F. Supp. 2d at 767 (quoting *Helling*, 509 U.S. at 36).[13] The mere fact that a prison has a no-smoking policy that is not fully enforced is insufficient to establish deliberate indifference. *Davidson*, 920 F. Supp. at 309 n. 1. However, the fact that a facility has instituted a smoking ban can also be seen as an admission that prison officials are aware that ETS poses a health risk. *Warren*, 937 F. Supp. at 306; *Gill*, 283 F. Supp. 2d at 769. Officials' failure to respond to a prisoner's complaints about ETS can also help to establish the subjective element. *Gill*, 283 F. Supp. 2d at 769.

*Gillespie v. Taylor*, No. 9:07-CV-0694 (GLS/GHL), 2009 U.S. Dist. LEXIS 89047, at

*20-27, 30-32 & n.23 (N.D.N.Y. Aug. 17, 2009) (Rep't-Rec.), *adopted*, 2009 U.S. Dist.

LEXIS 89049, 2009 WL 3165543 (N.D.N.Y, Sept. 24, 2009) (some citations omitted).

## B.    Relevant Facts

Defendant Jaquish has established, through his Statement of Material Fact (Dkt.

---

[13] "Deliberate indifference" requires more than negligence, but less than conduct undertaken for the very purpose of causing harm, and has been equated by the Supreme Court with a "reckless" state of mind. *Farmer v. Brennan*, 511 U.S. at 835-36, 839-40. To show that a prison official has, through deliberate indifference, violated an inmate's Eighth Amendment rights with respect conditions of confinement, a plaintiff must demonstrate that the defendant has knowingly and unreasonably disregarded an intolerable or excessive risk of harm. *Id*. at 836-37, 846.

No. 52-3), with little or no opposition by plaintiff, that: (1) C.O. Jaquish, who floated among various duty stations when the "steady" Correction Officers were not working, worked a total of 42 eight-hour shifts in plaintiff's housing unit, all but one on the midnight (11:00 p.m. to 7:00 a.m.) shift, from July 2016 (more than nine months after plaintiff arrived at Clinton Annex) until April 2017 (when plaintiff was transferred to Washington); (2) that Inmate Rules prohibited smoking at the Clinton Annex, except in designated outdoor areas, and that inmates were advised of these rules, by being provided a copy of the Standards of Inmate Behavior, and through no-smoking signs, including one posted above the bathroom in plaintiff's housing unit; (3) that C.O. Jaquish and other Correction Officers at the Clinton Annex issued warnings or misbehavior reports if they found an inmate smoking indoors or in other unauthorized locations; (4) C.O. Jaquish never saw an inmate smoking during his shifts in plaintiff's dormitory, and plaintiff never told C.O. Jaquish that a particular inmate was smoking in the bathroom, slop sink area, or shower; (5) that the slop sink area in plaintiff's housing unit was locked during the midnight shift, and was not accessible by inmates; and (6) plaintiff did not report to C.O. Jaquish that plaintiff suffered a medical issue due to second-hand smoke. (Def.'s Stmt. of Mat. Fact ¶¶ 1, 3, 4, 15-18, 19-21, 22, 23; Jaquish Decl. ¶¶ 4-15).

During his deposition, plaintiff testified that, prior to arriving at Clinton Annex, he had never smoked, had long suffered from sinusitis and extensive allergies, but had never been diagnosed with asthma or other respiratory illness. (Dep. Tr. at 15-17). During the time period after C.O. Jaquish started working at Clinton Annex, plaintiff

primarily lived in two "cubes" (numbers four and five) that were within ten feet of the dormitory bathroom. (Dep. Tr. at 31-33). Plaintiff testified that, although inmates did not smoke in the cubes, they smoked "twenty-four-seven" in the bathrooms, the shower, and the slop sink area. (Dep. Tr. at 33, 39, 67-68). He estimated that all but a "handful" of the approximately 50 inmates who resided in his dormitory smoked. (Dep. Tr. at 37). Plaintiff stated that there was a window in the bathroom that inmates, who were smoking, sometimes propped open sometimes, but "not a lot." (Dep. Tr. at 34-35).

Plaintiff testified that, when he used the bathroom, he was "[j]ust gagging. Non-stop coughing. My heart would be racing. I would feel dizzy and I was always changing my clothes." (Dep. Tr. at 38). Plaintiff stated that, he would try to rush back from breakfast so he could beat the smokers to the bathroom. (Dep. Tr. at 50). But, plaintiff's allergies were "just horrible" at Clinton Annex and his symptoms of coughing and sneezing "got worse" there. (Dep. Tr. at 51, 52). The "only thing" the medical staff could do was to provide him with medication. (Dep. Tr. at 56-60). However, plaintiff also acknowledged that he did not have any "acute allergy crisis" at Clinton Annex, nor did he seek "any kind of urgent medical allergy care." (Dep. Tr. at 70).

Plaintiff stated that C.O.s Jaquish and Courtney were the "nighttime officers" on his housing unit "most of the time." (Dep. Tr. at 18, 20, 21). He acknowledged that the C.O. on duty in his dormitory could not see inmates smoking in the bathrooms, but could "smell it." (Dep. Tr. at 34). Plaintiff testified that he complained "several times"

22

to Correction Officers other than C.O. Jaquish about the second-hand smoke, and the typical response was that the officer "couldn't do nothing about it" unless they caught an inmate smoking, in which case he would get a "ticket." (Dep. Tr. at 39-40, 43). He acknowledged that he knew that a couple of inmates were "written up" for smoking, and that officers, including C.O. Jaquish, sometimes warned inmates about smoking, although plaintiff felt the officers were just going through the motions. (Dep. Tr. at 65-68). When asked about complaining to C.O. Jaquish about second-hand smoke, plaintiff stated "I mentioned it to him and once again, C.O.s don't really care." (Dep. Tr. at 40-41).

### C.    Analysis

#### 1.    Claim of Present Harm from ETS

Plaintiff acknowledged that he was never diagnosed with asthma and never experienced an "acute allergy crisis" at Clinton Annex. He provided no medical records to document his allegations that he suffered from aggravated symptoms of gagging, non-stop coughing, a racing heart, and dizziness when exposed to ETS, much less more severe or long-term medical complications. Even if plaintiff's unsupported claims of health problems caused by ETS are credited, they do not rise to the level of a serious medical need sufficient to support an Eighth Amendment claim for present harm due to ETS. *See, e.g.*, *Johnson v. Fischer*, No. 9:12-CV-210 (DNH/TWD), 2015 WL 670429, at *9 (N.D.N.Y. Feb. 17, 2015) ("Medical conditions such as breathing problems, chest pains, dizziness, sinus problems, headaches, and loss of energy are 'relatively minor' and are not sufficiently severe to establish the objective prong of an

23

Eighth Amendment claim for present exposure to ETS"); *Gillespie v. Taylor*, 2009 U.S. Dist. LEXIS 89047, at *22-24 (finding no "serious" medical need where plaintiff did not suffer from asthma, and there was no medical evidence of any serious reaction to ETS beyond complaints of shortness of breath, coughing, and chest pain); *Klein v. Fischer*, No. 9:13-CV-437 (BKS/TWD), 2015 WL 5174031, at *21, n.15 (N.D.N.Y. Sept. 2, 2015) ("[m]edical conditions such as sinus problems exacerbated by ETS exposure have been held not to be a serious medical condition for Eighth Amendment claims"); *Liggins v. Parker*, No. 9:04-CV-966, 2007 WL 2815630, at *16 (N.D.N.Y. Sept. 25, 2007) (complaint of shortness of breath on at least one occasion, with no underlying diagnosis of asthma or similar condition, was insufficient to establish objective element of an ETS present-injury claim).

Even if plaintiff's then-current medical needs relating to ETS were "sufficiently serious," no rational fact finder could determine, on the present record, that defendant Jaquish was deliberately indifferent to any such medical needs. C.O. Jaquish averred that plaintiff never advised him of any medical problems he had relating to ETS, and plaintiff has not stated otherwise. Nor is there any evidence that C.O. Jaquish deliberately defied the express instructions of a plaintiff's doctors or deliberately interfered with medically prescribed treatment solely for the purpose of causing plaintiff harm or unnecessary pain. *See Gill v. Mooney*, 824 F.2d at 196. Accordingly, there is no material issue of fact that could support the position that defendant Jaquish was deliberately indifferent to plaintiff's serious medical needs, as required to establish the subjective prong of an Eighth Amendment claim for present harm due to ETS. *See,*

24

*e.g., Gillespie v. Taylor*, 2009 U.S. Dist. LEXIS 89047, at *25-26 ("[t]here is no evidence that Defendants could have drawn, or did in fact draw, the inference that Plaintiff had a serious medical condition caused or exacerbated by ETS"; "even if the evidence raised a triable issue of fact that Plaintiff suffered from a serious medical condition, I would recommend that the Court grant Defendants' motion for summary judgment and dismiss Plaintiff's claim regarding present harm from ETS exposure")

## 2. Claim of Future Harm From ETS

Plaintiff acknowledged that inmates did not smoke in the sleeping area of his dormitory, but smoked, at all hours of the day and night, particularly in the bathroom and slop sink area.  (Dep. Tr. at 33, 39, 67-68).  Although plaintiff testified that approximately 45 of the 50 inmates in his dormitory smoked (Dep. Tr. at 37), in his amended complaint, plaintiff alleged that "about 20 or more" inmates in his dormitory were smokers.  (AC ¶ III (7)).  He further alleged in the amended complaint that, throughout the day, five or more inmates would be smoking in the slop sink area,[14] and, that when plaintiff was in the bathroom, "someone, or sometimes two or more" inmates would come in and smoke.  (AC ¶ III (8)).  During his deposition, plaintiff also testified that he could mitigate the extent to which he was exposed to ETS by timing his trips to the bathroom to "beat the crowd."  (Dep. Tr. at 50).  Plaintiff's unsupported, and somewhat contradictory allegations about the levels of ETS to which he was exposed, do not rise to the level that would "violate[] contemporary standards of decency," as

---

[14] As plaintiff tacitly acknowledged in his Amended Complaint (¶ IV (12)), the slop sink area was locked and not available to inmates during the midnight shift, when C.O. Jaquish almost always worked during the relevant time period.

required to support the objective prong of Eighth Amendment claims of future harm

from ETS.  *See, e.g.*, *Eldridge v. Williams*, No. 10 CIV. 0423, 2013 WL 4005499, at \*7-

9 (S.D.N.Y. July 30, 2013) ("Courts have generally found ETS exposure to be

unreasonably high mainly when the plaintiff shares a cell with an inmate who is a

frequent or chain smoker, or when the plaintiff is housed in a cell surrounded by such

smokers. . . .  On the other hand, courts in this Circuit have generally found ETS

exposure to be insufficiently high when the exposure was limited to common areas

outside of immediate living quarters, such as recreational areas where a plaintiff is only

temporarily and/or voluntarily exposed to ETS." (collecting and distinguishing cases);

*Islam v. Connolly*, No. 07 Civ. 3225, 2011 WL 723568 at \*6 (S.D.N.Y. Feb. 16, 2011)

("While plaintiff need not establish a level of exposure to ETS equivalent to that of

*Helling*, 509 U.S. at 28, where plaintiff shared a cell with a chain-smoker who smoked

five packs of cigarettes a day, in order to survive summary judgment . . ., the plaintiff's

exposure to ETS as a result of defendants . . . smoking at their Station and the inmates

smoking in the bathroom[15] . . . does not rise to the level that a reasonable jury could

find 'so grave that it violates contemporary standards of decency to expose anyone

unwillingly to such risk.'" (citing, inter alia, *Griffin v. DeRosa*, 153 F. App'x. 851, 853

(3d Cir. 2005) (affirming district court finding that exposure to eight to ten inmates

smoking every time plaintiff went to any prison restroom over a twenty month period

failed to state a claim that plaintiff was exposed to levels of ETS that posed an

unreasonable risk of damage to his future health); *Gillespie v. Taylor*, 2009 U.S. Dist.

---

[15] Plaintiff Islam testified that when he entered the bathroom, approximately twelve times daily, he would be exposed for four or five minutes to six or seven inmates smoking.  *Id*. at \*6.

LEXIS 89047, at *28-30 (even if plaintiff inmate encountered second-hand smoke each and every time that he used the restroom, he was not so exposed in his sleeping quarters, his prison job, or in other common areas of the facility; his ETS exposure would be far less than that discussed in cases finding that an inmate might be able to establish the objective prong of a claim of future harm from ETS) (collecting and distinguishing cases); *Gill v. Bracey*, No. 99 Civ. 10429, 2001 WL 34045758, at *2, *4 (S.D.N.Y. Jul.17, 2001) (ETS did not rise to the level of cruel and unusual punishment where the plaintiff was exposed to the ETS for four-and-a-half hours a day while in the law library or in line at the medical dispensary; and he was not exposed to ETS in his cell); *Zaire v. Artuz*, No. 99 Civ. 9817, 2003 WL 230868, at *4-5 (S.D.N.Y. Feb. 3, 2003) (holding that inmate's exposure to ETS in common areas, but not in his cell, over five month period did not "rise to a level that a reasonable jury could find 'repugnant to the conscience of mankind'").[16]

Based on the evidence of record in this case, no rational fact finder could conclude that defendant Jaquish acted with deliberate indifference, by knowingly and unreasonably disregarding an intolerable or excessive risk of harm to plaintiff or other inmates from ETS in plaintiff's dormitory. "[M]ere imperfect enforcement of an indoor

---

[16] Cf. *Ward v. LeClaire*, No. 9:07-CV-26 (GTS/RFT), 2009 WL 6302822, at *3 (N.D.N.Y. Sept. 16, 2009) (Rep't-Rec.), *adopted*, 2010 WL 1189354 (N.D.N.Y. Mar. 24, 2010) (finding that plaintiff raised an issue of material fact with respect to the objective prong of his claim based on future harm from ETS, by his allegations, supported by affidavits from five other inmates, that he was exposed to seriously high levels of ETS from between May 2006 and January 2008, not only in the common areas such as the bath, shower, laundry, and TV rooms, but throughout the B-2 housing unit, including in the day-room and the sleeping dorm areas). The plaintiff in *Ward* offered more support for his claims about the level of ETS exposure than plaintiff Grayson, and documented exposure, not only in common areas, but in sleeping areas of his dormitory. Hence, *Ward* is distinguishable from this case.

smoking ban in a prison, as long as reasonable enforcement efforts are made, does not amount to deliberate indifference." *Eldridge v. Williams*, 2013 WL 4005499, at *12. *Accord, Klein v. Fischer*, 2015 WL 5174031, at *24; *Enigwe v. Zenk*, No. 03-CV-854, 2007 WL 2713849, at *6 (E.D.N.Y. Sept. 14, 2007).  As noted above, correction officers successfully  prevented inmates in plaintiff's dormitory from smoking among the housing "cubes."[17]  Plaintiff did not contradict C.O. Jaquish's statements that he never saw an inmate smoking during his 42 shifts in plaintiff's dormitory, but issued warnings or wrote misbehavior reports when he encountered violations of the no-smoking policy in other areas of the Clinton Annex.  Plaintiff acknowledged that C.O. Jaquish periodically warned inmates on his dormitory that if he caught them smoking in unauthorized places, he would write them a ticket.  (Dep. Tr. at 68).  In his declaration, C.O. Jaquish stated:

> As a general matter, I cannot enforce the smoking  rule if I do not know an inmate is violating the rule.  I am the only officer stationed in Dorm 6-2 on the midnight shift.  I cannot see into the bathroom from  my post and I cannot stay in the  bathroom in hopes of catching an inmate smoking in there.  I can only enforce the smoking rule if I see someone violating it or if someone tells me that a particular inmate is violating the rule.  Neither of these things happened during my midnight shifts in Dorm 6-2. . . .

(Jaquish Dec. ¶ 12).[18]  C.O. Jaquish also stated, without contradiction, that plaintiff

---

[17] When C.O. Jaquish worked on plaintiff's dormitory, almost always on the midnight shift, he ensured that the slop sink area was secured, so that it was not available for inmates to use for smoking.  (Jaquish Dec. ¶ 15).

[18] *See Gillespie v. Taylor*, 2009 U.S. Dist. LEXIS 89047, at *32, n.23 (suggesting that the "realities of prison administration," may be relevant to judging deliberate indifference–e.g., in determining whether it was feasible for officers, who worked alone during their shifts on a prison dormitory, to spend any significant time enforcing no-smoking rules).

never told him that a particular inmate was smoking in the bathroom, slop sink area, or shower. *See Islam v. Connolly*, 2011 WL 723568 at \*10 (plaintiff refused to provide the names of inmates who were smoking in the bathroom; by refusing to fully cooperate with the investigation, plaintiff hindered defendants' efforts to enforce the smoking policies).

While evidence that a particular correction officer ignored numerous, actionable complaints from inmates about ETS may indicate deliberate indifference,[19] a single complaint would generally not, particularly if it is not supported by other evidence.[20] During his deposition, plaintiff testified about complaining frequently about second-hand smoke to prison officials other than C.O. Jaquish (Dep. Tr. at 39-40, 43-47), but described only one instance when he claimed that he "mentioned" ETS to C.O. Jaquish, without providing any specifics about how defendant Jaquish responded. (Dep. Tr. at 40-41). Given the undisputed evidence regarding C.O. Jaquish's reasonable efforts to

---

[19] *See, e.g.*, *Ward v. LeClaire*, 2009 WL 6302822, at \*5 (finding a material issue of fact with respect to deliberate indifference of Officer Dutil who, plaintiff alleged, constantly allowed inmates to smoke cigarettes and cigars in the bathroom, shower, and slap-sink areas and ignored "numerous" complaints from plaintiff about excessive smoking in these areas; *Gillespie v. Taylor*, 2009 U.S. Dist. LEXIS 89047, at \*30-31, n.23 (finding that plaintiff raised a triable issue of fact with respect to deliberate indifference of two officers who frequently ignored plaintiff's complaints about ETS and watched television or read the newspaper instead of taking remedial action).

[20] *See, e.g.*, *Klein v. Fischer*, 2015 WL 5174031, at \*27 (given the conclusory nature of plaintiff's claims of deliberate indifference, and his failure to submit evidence challenging the declarations of correction officers who allegedly neglected to enforce non-smoking rules, the court finds that the record evidence does not support a finding of deliberate indifference on the part of the officers, including one to whom plaintiff once complained about smoking in the bathroom area, allegedly drawing a response of "What do you want me to do about it."); *Eldridge v. Williams*, 2013 WL 4005499, at \*12-13 (finding that no rational fact finder could find an officer deliberately indifferent to the risk to plaintiff from ETS, based on a single response to a smoking incident where he gave the offending inmate a warning, rather than issuing a misbehavior report).

enforce non-smoking rules at Clinton Annex, plaintiff's conclusory claims about a single complaint are not sufficient to establish a material issue of fact with respect to that defendant's alleged deliberate indifference. *See, e.g.*, *Klein v. Fischer*, 2015 WL 5174031, at *27 (discussed in note 20 above).

## IV.    Conclusions

Accordingly, this court would recommend that summary judgment be entered in favor of defendant Jaquish on the merits of plaintiff's Eighth Amendment claim, as well as on the grounds that plaintiff failed to exhaust his administrative remedies.  Given plaintiff's inability to exhaust his administrative remedies in the future with respect to the pending claim against any defendant, the court recommends dismissal of the amended complaint as against C.O. Courtney, as well as C.O. Jaquish.  Based on these rulings, the court need not address C.O. Jaquish's arguments based on his limited personal involvement in overseeing inmates in plaintiff's housing unit at Clinton Annex during part of the relevant time period.

**WHEREFORE**, based on the findings above, it is

**RECOMMENDED**, that defendant Jaquish's motion for summary judgment (Dkt. No. 52) be **GRANTED**, and that the surviving claim in plaintiff's Amended Complaint be **DISMISSED WITH PREJUDICE**, against defendants C.O. Jaquish and C.O. Courtney.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have 14 days within which to file written objections to the foregoing report.  Such objections shall be filed with the Clerk of the Court.  **FAILURE TO OBJECT TO THIS REPORT WITHIN 14 DAYS**

**WILL PRECLUDE APPELLATE REVIEW.**  *Roldan v. Racette*, 984 F.2d 85 (2d

Cir. 1993) (citing *Small v. Secretary of Health and Human Services*, 892 F.2d 15 (2d

Cir. 1989)); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72, 6(a), 6(e).


Dated:  December 3, 2018

Hon. Andrew T. Baxter
U.S.  Magistrate Judge